IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SHANNON WILLIAMS, | |
| Plaintiff, | 8:11-CV-446 |
| vs. | |
| RAYNOR RENSCH & PFIEFFER, *et al.*, | MEMORANDUM AND ORDER |
| Defendants. | |

This matter is before the Court on the motions for dismissal or for summary judgment filed by defendants (filings 194, 196, 198, 200, 202, and 204) and the motion for summary judgment filed by plaintiff Shannon Williams (filing 214), who is proceeding before the Court *pro se*. Williams has also requested an evidentiary hearing (filing 246) and requested leave to conduct discovery (filing 248). All three of Williams' motions will be denied. The motions of defendants John Brazda, Dave Bruck, and John Stuck (filing 194); the City of Bellevue (and its Police Department) (filing 196); Douglas County, Mark Foxall, and Jeffrey Newton (filing 198); and the City of Omaha and Omaha Police Department (filing 204) will be granted, and all claims against these defendants will be dismissed. The remaining defendants' motions (filings 200 and 202) will be granted in part and denied in part. The handful of claims remaining against those defendants rest solely on state law and do not satisfy the amount in controversy requirement for diversity jurisdiction. The Court will decline to exercise its supplemental jurisdiction over those claims, which will be remanded to the District Court for Douglas County, Nebraska.

## I. INTRODUCTION

This case arrives with a lengthy and complicated procedural history and detailed factual background. Before proceeding further, it will help to provide a broad outline of the circumstances leading up to this case and introduce the parties involved. The Court will then provide a more detailed accounting of this case's procedural background, as it is essential to understanding Williams' complaint. Further facts will be discussed below as they become relevant.

Starting no later than 2006, Williams was involved in a conspiracy to import marijuana into the Omaha, Nebraska area.[1] In 2007, a warrant was issued for Williams' arrest for various violations of his term of supervised release imposed as part of his sentence for a previous federal drug conviction. Williams evaded arrest for some time. Meanwhile, in October 2008, defendant Terry Haddock, an attorney, began representing an associate of Williams, Richard Conway. Conway had been arrested following delivery of a controlled shipment of marijuana from another of Williams' associates. Conway, in turn, put Haddock in contact with Williams (who was still in hiding). Unbeknownst to Williams, Conway had agreed to cooperate with authorities, who were interested in Williams due to his ongoing drug activities and his violations of supervised release. Williams, and his continuing drug operations, became the target of an investigation by a joint task force directed by the FBI, and which included police officers from Omaha and Bellevue, Nebraska (including defendants Bruck, Brazda, and Stuck).

In late 2008, Williams began contacting Haddock by telephone. Haddock and Williams discussed, among other things, the marijuana charges pending against Conway. During one conversation, Williams suggested that he intended to kill two of the key witnesses against Conway, a threat which Haddock reported to law enforcement. (Haddock also passed other useful information to law enforcement, which ultimately helped the authorities locate Williams.) Williams and Haddock also discussed various legal matters. For example, Williams asked Haddock, on behalf of a friend, about the sentencing disparities between crack and powder cocaine under the federal sentencing guidelines. And they discussed the outstanding warrant for the supervised release violation. However, as the Eighth Circuit found, "[a]t all times, Williams was represented by either [Eric] Whitner or his cocounsel, attorney Steve Lefler—not Haddock." *Williams*, 720 F.3d at 683. In January 2009, Williams caused $15,000 to be paid to Haddock for legal services that Haddock had provided to Conway and another of Williams' friends.

When Williams was finally apprehended in February 2009, he was incarcerated at the Douglas County Correctional Center ("DCCC") in Omaha, Nebraska, where Conway was also being held. In early 2009, Haddock worked with law enforcement officers and officials at DCCC to place Conway in the same cell with Williams. Conway was fitted with a recording device

---

[1] These facts, provided for background purposes only, are drawn from the Eighth Circuit's decision affirming Williams' conviction, *United States v. Williams*, 720 F.3d 674 (8th Cir. 2013), and Senior United States District Judge Strom's Memorandum and Order of March 21, 2011, denying Williams' motion to suppress and motion to dismiss the indictment in his 2009 criminal case. Case no. 8:09-cr-457, filing 723. The Court refers the reader to those sources for further details.

and recorded several hours of conversation in which Williams made incriminating statements.

While he was in custody at the DCCC, Williams paid Whitner to sneak a cell phone in, which Williams used to continue managing his drug operations from inside the detention center. Eventually, Williams came to distrust Whitner, and he asked Conway if Haddock would be willing to smuggle a cell phone into the DCCC. Williams agreed to pay Haddock $1,000 a month for this service. Haddock passed this information onto the authorities, and they devised a plan to use Haddock to record Williams' phone conversations and acquire evidence regarding his ongoing drug and money-laundering operations.

On April 22, 2009, Haddock made his first trip to the DCCC to bring Williams the phone. Between then and December 2009, he made a total of sixty-three visits to Williams. These meetings occurred in the DCCC's attorney-client meeting rooms. Haddock repeatedly told Williams that he was not acting as Williams' attorney, but merely facilitating his use of the (contraband) cell phone. As the Eighth Circuit explained, the ruse worked as follows:

> During each of Haddock's visits to Williams, detention-center officials knew that Haddock was operating as an informant on Williams and was not Williams's actual attorney. Haddock, however, convinced Williams that the detention-center officials thought that he was Williams's attorney and that was why he was allowed to see Williams, even though Williams knew that Haddock was not his attorney.

*Williams*, 720 F.3d at 684.

Over the course of these sixty-three visits, Haddock recorded nearly 200 hours of conversations between himself and Williams and between Williams and various people he called. Many of these calls involved criminal activities. In December 2009, Williams and several others were indicted for conspiring to violate federal drug and money-laundering laws. Evidence gathered from Haddock's recordings was used to convict Williams, who is currently serving a 480-month sentence on those charges.

However, Williams also used the cell phone to make calls to Lefler, who was representing him on the supervised release violation. The recording, disclosure, and use of those calls forms the basis of much of Williams' operative complaint. Filing 188. Williams seeks compensatory and punitive damages, as well as injunctive relief, based on various claims arising under the United States Constitution (and the corresponding provisions of the Nebraska constitution), federal and state wiretap and racketeering statutes,

and state contract and tort law. Williams' operative complaint names 18 defendants, which may be divided into five groups. Filing 188 at 1.

The first group, the "Federal Defendants," consists of defendants Stuck, Brazda, and Bruck, who were law enforcement officers with the Bellevue and Omaha Police Departments. They participated in the joint state-FBI task force that investigated Williams and used Haddock as an informant. As the Court explains below, all three officers were acting under color of federal, rather than state, law.[2]

The second group, the "Municipal Defendants," consists of the City of Omaha and the City of Bellevue. Williams has also sued the cities' police departments. However, a police department is simply a department or subdivision of a city's government; it is not a juridical entity suable as such. *Ketchum v. City of West Memphis,* 974 F.2d 81, 82 (8th Cir. 1992); *Meyer v. Lincoln Police Dept.*, 347 F. Supp. 2d 706 (D. Neb. 2004). So, the Court will dismiss all of Williams' claims against the Omaha and Bellevue Police Departments as separate entities.

The third group, the "Douglas County Defendants," consists of Douglas County; Jeffrey Newton, the director of the DCCC; and his assistant director, Mark Foxall. The fourth group, the "Law Firm Defendants," consists of the law firm of Raynor Rensch & Pfeiffer ("RR&P")—Haddock's former law firm—as well as its partners John P. Raynor, Richard J. Rensch, and William E. Pfeiffer; and various other attorneys who worked for the firm: Patrick M. Heng, John J. Kohl, and Sean P. Rensch. Last, there is defendant Haddock, who does not fit precisely into any of the groups above.

## II. STANDARD OF REVIEW

With this broad outline in hand, the Court turns to a more detailed examination of the proceedings leading up to this case. The Court will take a moment, however, to clarify what matters it has considered in ruling on the pending motions. The defendants have moved to dismiss Williams' complaint for failure to state a claim under Rule 12(b)(6), and alternatively, for summary judgment under Rule 56. The Federal Defendants have also moved to dismiss Williams' official-capacity claims against them—which are, in effect, claims against the United States—as barred by sovereign immunity. This presents a question of jurisdiction under Rule 12(d)(1).

The Court has resolved the non-jurisdictional aspects of the pending motions on the pleadings, under Rule 12(b)(6). Even assuming the truth of Williams' allegations, he has failed to plead a plausible claim for relief on each and every claim that the Court has considered. The prior proceedings

---

[2] The distinction is ultimately of little importance except that it informs the Court's sovereign immunity analysis.

discussed in part III, *infra*, are judicially-noticeable public records that the Court may consider in reviewing a Rule 12(b)(6) motion to dismiss without converting the motion into one for summary judgment under Rule 12(d). *See Levy v. Ohl*, 477 F.3d 988 (8th Cir. 2007). More precisely, the Court takes notice of the documents and orders filed in these cases, not for the truth of their contents but only to determine what the documents stated. *See, e.g.*, *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006); *see also Veteran Constructors, Inc. v. Beeler Barney and Assocs. Masonry Contractors, Inc.*, case no. 2:13-cv-64-f, 2014 WL 4199238, at *3 (E.D.N.C. Aug. 22, 2014).

But the Court would reach the same result under Rule 56. Williams has verified his complaint, and submitted evidentiary materials and affidavits in support of his complaint and his motion for summary judgment. The Court has carefully considered these materials, and they do not change the Court's analysis or decision. Williams' claims fail not because he has failed to substantiate the allegations in his complaint, but because those allegations, even if proven, would not entitle Williams to relief. For the same reasons, Williams' request for an evidentiary hearing (filing 246) and his request to conduct limited discovery (filing 248) are denied.[3]

## A. Jurisdiction - Fed. R. Civ. P. 12(b)(1)

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges whether the Court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). A Rule 12(b)(1) motion can be presented as either a "facial" or "factual" challenge. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).

Sovereign immunity is a jurisdictional, threshold matter that is properly addressed under Rule 12(b)(1). *See, Lors v. Dean*, 746 F.3d 857, 861 (8th Cir. 2014); *Brown v. United States*, 151 F.3d 800, 803–04 (8th Cir. 1998). The Federal Defendants' motion, based on sovereign immunity, asks the Court to consider matters beyond the pleadings, and presents a factual challenge. When reviewing a factual challenge, the Court considers matters outside the pleadings, and the nonmovant does not receive the benefit of Rule

---

[3] Williams asserts that the discovery "sought will prove that the allegations in the [c]omplaint are true." Filing 249 at 10. The Court has already denied Williams' request to conduct discovery. *See* filing 244. More importantly, the Court has assumed the truth of the allegations in the complaint, and Williams' claims nonetheless fail. The discovery sought would not alter the Court's analysis or decision.

In resolving the pending motions for dismissal or summary judgment, the Court has also considered the facts contained in Williams' affidavit in support of his motion to conduct discovery. *See* filing 249. This newest filing has also not altered the Court's decision.

12(b)(6) safeguards. *Osborn*, 918 F.2d at 729 n.6. Moreover, unlike a motion for summary judgment, the Court is free to resolve disputed issues of fact. *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008).

## B. Failure to State a Claim - Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* While the Court must accept as true all facts pleaded by the nonmoving party and grant all reasonable inferences from the pleadings in favor of the nonmoving party, *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012), a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. *Iqbal,* 556 U.S. at 678. Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* at 679.

## C. Summary Judgment - Fed. R. Civ. P. 56

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

III. PROCEDURAL BACKGROUND

**A. The Supervised Release Violation**

On December 10, 2007, the United States Probation Office filed a Petition for Offender Under Supervision against Williams, alleging several violations of his term of supervised release, which was imposed as part of a 1994 conviction for conspiracy to possess cocaine with intent to distribute. *See* case no. 8:93-cr-27 filing 618 [hereinafter, "VSR filing ___" (Violation of Supervised Release)]. The violations did not relate to Williams' large-scale marijuana operations, but involved, among other things, charges of driving under the influence, possession of a small amount of marijuana, and failing to report to his probation officer. VSR filing 618. A warrant for Williams' arrest was promptly issued, but Williams was not arrested until February 2009. *See* VSR filing 622. On April 3, 2009, an Amended Petition was issued, which added a violation related to charges Williams was facing in Arizona state court for indecent exposure and felony possession of marijuana. VSR filing 629 at 3.

Williams was represented by Whitner, and then Lefler, in the supervised release proceedings. *See* VSR filings 631, 650, and 651. On September 30, 2009, Williams signed a plea agreement in which he admitted all of the violations alleged in the Amended Petition, and agreed, under Fed. R. Crim. P. 11(c)(1)(C), to receive a sentence of 5 years' imprisonment. In exchange, the Arizona charges were to be dismissed. VSR filing 677. On October 1, the Court (Senior United States District Judge Bataillon) accepted Williams' plea. VSR filings 678 and 689. At the hearing, Williams again admitted to the allegations in the Amended Petition. VSR filing 689 at 10–16. On Williams' motion, sentencing was continued multiple times and was eventually postponed until his criminal case had been resolved. *See generally* VSR docket sheet, filings 678 through 728.

**B. The 2009 Criminal Case[4]**

On December 16, 2009, an indictment was filed in this Court, charging Williams and others with conspiracy to violate federal drug and money-laundering laws. Case no. 8:09-cr-457, filing 1 [hereinafter "CR Filing ____"]. Judge Strom was assigned to the case. Following the indictment, Williams learned that the authorities had used Conway and Haddock to record his conversations and calls at the DCCC. In response, Williams filed a motion to

---

[4] The Court will generally refer to case no. 8:09-cr-457 as "the criminal case" (as opposed to the supervised release proceedings in case no. 8:93-cr-27).

dismiss the indictment or suppress the evidence and statements gathered from the recordings. CR filings 213 and 215. In March 2011, after several evidentiary hearings, the Court denied Williams' motions, concluding that the government had not violated Williams' constitutional rights in recording his conversations or calls. CR Filing 723.

Williams' case proceeded to trial, which lasted for most of April 2011. *See* CR filings 769 and 830. On April 28, Williams was found guilty on all counts. CR Filing 834. On November 7, he was sentenced to a total of 480 months' imprisonment. CR filing 1180. Williams appealed, arguing, among other things, that the District Court erred in failing to suppress the recordings of his phone calls. CR filing 1177; *United States v. Williams*, No. 11-3437, filing of Nov. 8, 2011 [hereinafter, "App. filing of [date]"]. Although Williams was represented by appellate counsel, he also submitted a supplemental *pro se* brief. *See* App. filing of Nov. 20, 2012. On July 11, 2013, the Eighth Circuit issued a decision affirming the District Court, rejecting all of Williams' arguments (*pro se* and otherwise), and affirming Williams' conviction. *United States v. Williams*, 720 F.3d 674 (8th Cir. 2013).[5]

### C. Further Supervised Release Proceedings

As noted above, while the criminal case against Williams was pending, the supervised release proceedings had been continued several times on Williams' motion. And the supervised release proceedings were also reassigned to Judge Strom. VSR filing 691. On June 30, 2011, Williams (through new counsel) filed a Motion to Withdraw Admissions and to Dismiss the Amended Petition. VSR filing 705. Williams alleged, among other things, that the government used Haddock to convince Williams to plead guilty to the violations in the Amended Petition and that Haddock had disparaged Lefler's abilities as an attorney. Williams argued that this constituted outrageous government conduct in violation of his right to due process under the Fifth Amendment, and interference with his right to counsel in violation of the Sixth Amendment. VSR filings 705, 706, and 717. On August 22, the Court denied Williams' motion. VSR filing 721.

Sentencing was set for November 2011, to coincide with Williams' sentencing in the criminal case. *See* CR filing 1216 at 2. On November 4, 2011, Williams was sentenced in the criminal case, but sentencing on his supervised release violations was continued for further proceedings. Then, on November 9, the government filed a Motion for Reconsideration and Motion to Dismiss, asking the Court to reconsider its earlier decision (on Williams' motion to dismiss) and to dismiss the Amended Petition in the interests of

---

[5] Williams filed a petition for a writ of certiorari, which was denied. *See* App. filings of Jan. 7, and Feb. 24, 2014.

justice. VSR filing 729. Although styled as a motion to reconsider, the government's motion was not an admission that Williams' prior motion had merit. Rather, the government concluded that because Williams had recently been sentenced to 480 months' imprisonment in the criminal case, the interests of justice were not served by seeking to impose another 5 years' imprisonment. VSR filing 729. The Court granted the government's motion on November 10 and dismissed the Amended Petition. VSR filing 731.

### D. The Present Lawsuit

This suit was initially filed in Nebraska state court on November 3, 2011, and was removed to this Court in December 2011, where it was assigned to Judge Strom. After various proceedings, Williams requested leave to file an amended complaint on August 30, 2013. Filing 141. The Court granted the motion, but ordered Williams to file an amended complaint "containing all claims against all defendants." Filing 176 at 12. Williams filed his operative complaint on February 7, 2014. Filing 188. The defendants then filed the pending motions to dismiss or for summary judgment. In June 2014, the case was reassigned to the undersigned judge. Filing 222. Briefing on these and other motions continued until September 2014, and all motions are now ripe for disposition.

### IV. ANALYSIS

In his operative complaint, Williams has taken the "kitchen sink" or "shotgun" approach to pleading. He has pleaded nearly every claim—and his claims are numerous—against every defendant under a variety of legal theories. Williams' claims implicate numerous constitutional provisions, including (but not limited to) the Fourth, Fifth, Sixth, and Fourteenth Amendments, as well as their counterparts in the Nebraska constitution. He also alleges violations of: the federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90–351, 82 Stat. 212–223, *codified at* 18 U.S.C. §§ 2510–2520 [hereinafter, the "Federal Wiretap Act"]; Nebraska's intercepted communication statutes, Neb. Rev. Stat. §§ 86-271 to 86-2,116 [hereinafter, the "Nebraska Wiretap Act"]; the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968; Nebraska's "little RICO" known as the Public Protection Act, Neb. Rev. Stat. §§ 28-1352 to 28-1356; as well as state-law claims for breach of contract, fraud, unjust enrichment, and invasion of privacy. *See* filing 188 at 7–8.

Williams' pleadings are far from the "short and plain" statement required by Fed. R. Civ. P. 8. However, the Court has carefully considered all of the potentially cognizable claims set forth in Williams' operative complaint. With the exception of a handful of state-law claims that will be remanded to state court, the Court finds all of Williams' claims to be without

merit.[6] In this Memorandum and Order, the Court has set forth its analysis of the majority of Williams' claims. The Court finds it unnecessary to discuss the remainder in such detail.

In its discussion below, the Court first takes a moment to sort through Williams' individual and official-capacity claims. The Court then considers defendants' arguments that most or all of Williams' claims are barred by either collateral estoppel or *Heck v. Humphrey*, 512 U.S. 477 (1994). Finally, the Court discusses the merits of Williams' remaining claims—or at least those that warrant discussion.

## A. Individual and Official Capacities; State and Non-State Actors

Individual (or "personal") capacity suits seek to impose personal liability upon a government official for actions he or she takes under color of state (or federal) law. *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971); *see also Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1174 (9th Cir. 2007). Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. *Hafer*, 502 U.S. at 25. Suits against state and federal officials in their official capacities therefore should be treated as suits against the state and federal government. *See id.*

Williams asserts his claims against all the defendants in both their official and individual capacities. For some of the defendants, this makes sense; but for others, it does not. The Court will begin by pruning some of the official-capacity claims from this case entirely, and by placing Williams' remaining claims in context. The Court starts with the Federal Defendants. The Court finds that they were, at all relevant times, acting under color of federal law, and that Williams' official-capacity claims against them are barred by sovereign immunity. Williams' individual-capacity claims against the Federal Defendants are considered below, and all of those claims are either precluded by prior litigation or fail on their merits.

### 1. Official Capacity Claims Against Federal Defendants

Absent a waiver, sovereign immunity shields the federal government from suit. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994). The Federal Defendants have all submitted affidavits describing their roles in the investigation of Williams. At all relevant times, defendants Brazda and Stuck were officers with the Bellevue Police Department who were assigned to the Greater Omaha Safe Streets Task Force. The Task Force conducted

---

[6] This is not to imply that these claims, by contrast, do have merit, and the Court expresses no opinion on the matter.

investigations into, among other things, gangs, drug trafficking, and money laundering. The Task Force was made up of federal, state, and local law enforcement officers, and was headed by the FBI. Filing 81-2 at ¶¶ 1–3; filing 81-1 at ¶¶ 1–2. And defendant Bruck, who was also a member of the Task Force, was an officer with the Omaha Police Department. Filing 81-3 at ¶¶ 1–2, 8. All three officers were cross-deputized as Special Federal Officers of the FBI, and investigated Williams as part of an FBI operation. Filing 81-1 at ¶¶ 2–3, 7–8 & pp. 4–6; filing 81-2 at ¶¶ 5, 8; filing 81-3 at ¶¶4, 7; *see also* 21 U.S.C. § 878.

Williams has not offered any evidence or allegations to contradict these affidavits. The Court therefore finds that the Federal Defendants were, at all relevant times, acting under color of federal law. Williams' claims against the Federal Defendants in their official capacities are therefore claims against the United States. And the United States is entitled to sovereign immunity on (nearly) all of those claims.[7]

The constitutional violations that Williams alleges are cognizable as *Bivens* claims against the Federal Defendants—but only in their individual capacities.[8] However, as official-capacity claims, these must fail, as *Bivens* did not waive the United States' immunity for constitutional claims. *See, Meyer*, 510 U.S. at 483–86; *Reinbold v. Evers*, 187 F.3d 348, 355 & n.7 (4th Cir. 1999). Similarly, the United States has not waived its immunity for claims under Title III. *See* 18 U.S.C. § 2520 (permitting civil suits against "any person . . . other than the United States"). The United States and its agencies do not qualify as "persons" capable of violating RICO. *See, McNeily*

---

[7] The Court does not analyze Williams' claims for breach of contract, unjust enrichment, or invasion of privacy in this section. Williams has only alleged the breach of contract claim against Haddock and the Law Firm Defendants. *See* filing 188 at ¶¶ 40, 48, 54. To the extent he intended to allege a contract claim against the remaining defendants, any such claim would fail, as he has not alleged any facts suggesting they were parties to any contract. Similarly, Williams has alleged no facts to suggest any defendants other than Haddock and the Law Firm Defendants have retained money that they ought, in fairness, to return to him. *See Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 302 (Neb. 2006). So, his complaint also fails to state a claim for unjust enrichment against any other defendants. Finally, his invasion of privacy claim fails as a matter of law, for reasons discussed below.

[8] *Bivens* established that the victims of violations by federal agents have a right to recover damages against the officials in federal court despite the absence of any statute conferring such a right. *See Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006). "The effect of *Bivens* was, in essence, to create a remedy against federal officers, acting under color of federal law, that was analogous to the section 1983 action against state officials." *Abella v. Rubino*, 63 F.3d 1063, 1065 (11th Cir. 1995). Williams' operative complaint is styled as an action brought under 42 U.S.C. § 1983, but the Court will construe his claims against the individual Federal Defendants as *Bivens* claims.

*v. United States*, 6 F.3d 343, 350 (5th Cir. 1993); *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991).

Williams' state-law claim of fraud fares no better. The Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*, offers a limited waiver of the federal government's sovereign immunity. It provides the exclusive remedy for tort claims against the United States or its agencies or for torts committed by federal employees while acting within the scope of their duties. 28 U.S.C. § 2679(a) & (b)(1). However, this waiver is subject to the "intentional torts" exception. The FTCA does not waive the United States' sovereign immunity for any claim "arising out of . . . misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). This exception applies to bar any fraud claim against the Federal Defendants.

That leaves Williams' claims under the Nebraska constitution, Nebraska's Public Protection Act, and the Nebraska Wiretap Act. The United States, "as sovereign, is immune from suit save as *it* consents to be sued." *United States. v. Mitchell*, 445 U.S. 535, 538 (1980) (emphasis supplied). The FTCA does not waive sovereign immunity for these claims, and the State of Nebraska lacks the power to waive the United States' sovereign immunity. So, as against the Federal Defendants in their official capacities, these claims also fail.

## 2. Municipal Defendants and Douglas County Defendants

While the Court considers the Federal Defendants to have been acting under color of federal law, the Municipal and Douglas County Defendants were acting under color of state law. So, Williams has properly alleged his constitutional claims against these defendants under 42 U.S.C. § 1983, rather than *Bivens*. The distinction, however, is more academic than substantive,[9] as Williams' constitutional claims are all either precluded by previous litigation or fail on their merits. And Williams' other claims against these defendants likewise fail on their merits or are barred by the Political Subdivisions Tort Claims Act ("PSTCA"), Neb. Rev. Stat. §§ 13-901 to 13-928, which the Court discusses below.[10]

---

[9] "Though more limited in some respects not relevant here, a *Bivens* action is the federal analog to suits brought against state officials under . . . § 1983." *Hartman*, 547 U.S. at 254 n.2. With exceptions not relevant at this juncture, courts generally apply § 1983 law to *Bivens* actions and vice versa. *Abella*, 63 F.3d at 1063; *see, e.g.*, *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995); *Del Raine v. Williford*, 32 F.3d 1024, 1047 (7th Cir. 1994). Thus, the Court applies the same analysis to all of Williams' constitutional claims.

[10] Similarly, there is no need to distinguish between Williams' claims against these defendants in their individual versus official capacities. The City of Omaha, City of Bellevue, and Douglas County are municipal entities that only have one capacity. Foxall and Newton have both individual and official capacities, but the distinction is not worth

### 3. The Law Firm Defendants and Haddock

Williams has also brought his claims against the Law Firm Defendants in their "official" and individual capacities. However, the Law Firm Defendants were private, i.e., non-state actors, which means they have no "official" capacities. And more importantly, that means that Williams' § 1983 claims against them fail for lack of a state actor. See *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007).

Williams argues that the Law Firm Defendants were state actors by virtue of the attorneys' memberships in the Nebraska Bar Association. *See, e.g.* filing 188 at ¶¶ 62, 64, 112. But private counsel are not state actors (and as such, neither is their firm). *See Dunn v. Hackworth*, 628 F.2d 1111, 1112–13 (8th Cir. 1980). Private actors may also be liable under § 1983 for conspiring with state officials. *See White v. McKinley*, 519 F.3d 806, 815–16 (8th Cir. 2008).[11] But it requires more than conclusory allegations of conspiracy to consider a private party a state actor for purposes of § 1983. *See Simmons v. Sacramento Cnty. Superior Court*, 318 F.3d 1156, 1161 (9th Cir. 2003). Williams has not alleged any facts that plausibly suggest a connection between the Law Firm Defendants and the government defendants, let alone a conspiracy. But even if the Law Firm Defendants were somehow considered state actors, Williams' constitutional claims are either issue-precluded or fail on their merits.

On the other hand, the Court will assume that Haddock was acting under color of state or federal law, due to his extensive cooperation with the Federal Defendants, and his participation in their investigation of Williams. Nonetheless, Williams' constitutional claims against Haddock are either precluded by prior litigation or fail on their merits. And with the exception of Williams' claims for breach of contract, fraud, and unjust enrichment, which will be remanded to state court, the remainder of Williams' claims against both Haddock and the Law Firm Defendants fail on their merits.

## B. Collateral Estoppel

Defendants argue that many of Williams' claims are barred by collateral estoppel. Collateral estoppel, also known as issue preclusion, bars the relitigation of factual or legal issues that were actually and necessarily determined in a prior court action. *Banks v. Int'l Union Elec., Elec., Technical, Salaried and Machine Workers*, 390 F.3d 1049, 1054 (8th Cir.

---

addressing, as Williams' claims against them are either precluded by prior litigation, fail on their merits, or are barred by the PSTCA.

[11] The Court will assume, for the sake of argument, that a similar *Bivens* action is available against private parties conspiring with federal actors, although there is reason to doubt that proposition. *Cf. Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001).

2004); Restatement (Second) of Judgments § 27 (1982). Although the doctrine more commonly arises when two civil cases are involved, it also applies to bar relitigation of matters previously decided in a criminal case. *See*, *Emich Motors v. General Motors*, 340 U.S. 558, 568–69 (1951); *White v. Murphy*, 789 F.2d 614, 616 (8th Cir. 1986).

A party asserting issue preclusion must prove five elements: (1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit; (2) the issue sought to be precluded must be the same as the issue involved in the prior action; (3) the issue sought to be precluded must have been actually litigated in the prior action; (4) the issue sought to be precluded must have been determined by a valid and final judgment; and (5) the determination in the prior action must have been essential to the prior judgment. *Sandy Lake Band of Miss. Chippewa v. United States*, 714 F.3d 1098, 1102–03 (8th Cir. 2013). Additionally, the party against whom preclusion is asserted must have had a full and fair opportunity and incentive to litigate the issue in the prior action. *Banks*, 390 F.3d at 1054.

Defendants argue that Williams has already litigated many of his claims in his criminal case and is now precluded from relitigating them here.[12] The Court agrees. Briefly stated, the Court finds that the criminal case precludes Williams from relitigating certain claims under the Fourth Amendment, the Federal Wiretap Act, and the Nebraska Wiretap Act. However, the Court finds that Williams' Sixth Amendment claims are not precluded—although they nonetheless fail on their merits, as discussed below.

## 1. Fourth Amendment

The Court begins with Williams' claim that the recording of his calls to Lefler violated the Fourth Amendment. In his 2011 appeal to the Eighth Circuit, Williams raised this same argument in support of his contention that the District Court erred in not suppressing the recordings. *See* App. filing of Nov. 20, 2012, at 84–88. Although the Court of Appeals did not find that this argument warranted discussion, the Court did consider and reject it, stating:

---

[12] Defendants also argue that Williams has already litigated several more of his claims in the supervised release proceedings and is now barred from relitigating them. *See* filing 225 at 8. However, as noted above, for collateral estoppel to apply there must have been a valid and final judgment. *Sandy Lake*, 714 F.3d at 1103. The supervised release proceedings did not proceed to a final judgment on the merits, as the Amended Petition was dismissed on the government's motion. The Court need not determine whether the order rejecting Williams' motion might nonetheless be considered sufficiently final for purposes of issue preclusion. *See, e.g.*, *Robinette v. Jones*, 476 F.3d 585, 589 (8th Cir. 2007). Instead, the Court has considered the claims themselves, and, as explained below, finds them lacking in merit.

- 14 -

"Arguments that Williams raised in his *pro se* brief that are not discussed below have been carefully considered by the Court and determined to be meritless." *Williams*, 720 F.3d at 695. Thus, these issues have been actually litigated and were necessary to the Court of Appeals' decision to affirm Williams' conviction and deny his request for a new trial.[13]

There is at least one arguable distinction between the issues raised in Williams' current lawsuit and his previous appeal—but it is a distinction that ultimately makes no difference for the merits of Williams' claims. In his criminal case, Williams was necessarily focused on attacking the recordings of his calls to his criminal associates. Those calls yielded significant, incriminating evidence that played an important role in the criminal case. In contrast, Williams' calls to Lefler did not play any significant role in the criminal case against him.[14] But in the current lawsuit, the relative significance of these issues is reversed. Williams' current lawsuit focuses on the calls to Lefler. And therein lies the potential distinction: Lefler was Williams' attorney. And they were discussing not drug operations, but how Williams could best defend his supervised release charges.

Williams has not, however, identified any other difference between his calls to Lefler and his calls to his criminal associates. Thus, while the *content* of the calls may have differed, their *context* did not. The calls to Lefler occurred under the same factual circumstances as Williams' calls to his criminal associates. And it is those circumstances—that context—which matters for purposes of the Fourth Amendment (as opposed to the Sixth Amendment). In other words, the substance of Williams' Fourth Amendment claim has already been litigated and decided against Williams.

And to the extent Williams' attorney-client relationship with Lefler could potentially make a difference for purposes of issue preclusion, it does not change the fact that this claim fails on its merits. To show that the recording of his calls to Lefler violated the Fourth Amendment, Williams must show he had a reasonable expectation of privacy in the conversations. *See*, *United States v. Bearden*, 780 F.3d 887, 892 (8th Cir. 2015); *United States v. Peoples*, 250 F.3d 630, 636 (8th Cir. 2001). This requires him to show

---

[13] It is of no moment that the Court of Appeals found the argument unworthy of discussion. The doctrine of collateral estoppel applies to matters necessarily decided in the former judgment even if there is no specific finding or reference thereto. *Irving v. Dormire*, 586 F.3d 645, 648 (8th Cir. 2009); *see also Grubb v. Pub. Utils. Comm'n of Ohio*, 281 U.S. 470, 477–78 (1930) ("Omitting to mention that question in the opinion did not eliminate it from the case or make the judgment of affirmance any the less an adjudication of it.").

[14] Even so, Williams did specifically argue in his *pro se* appellate brief that the District Court erred in failing to suppress the calls to Lefler, and that the recording of these calls violated the Fourth Amendment and the Federal Wiretap Act. *See, e.g.*, App. filing of Nov. 20, 2012, at 85.

that (1) he had a subjective expectation of privacy in the conversations; and (2) that this expectation was, under the circumstances, objectively reasonable. *See*, *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Peoples*, 250 F.3d at 636. The second prong goes to whether Williams' subjective expectation of privacy was justifiable or legitimate, that is, "'one that society is prepared to recognize as "reasonable."'" *Smith*, 442 U.S. at 740 (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

Williams made his calls to Lefler on a cell phone—a contraband cell phone that he was paying Haddock to smuggle into the DCCC. Whatever Williams' subjective beliefs were, the Court finds that society is not prepared to recognize as reasonable a prisoner's expectation of privacy in conversations over a contraband cell phone. "It is well settled that prisoners have no reasonable expectation of privacy in the belongings they keep with them." *United States v. Huart*, 735 F.3d 972 (7th Cir. 2013) (citing *Hudson v. Palmer*, 468 U.S. 517, 527 (1984)). Determining whether an expectation of privacy is "legitimate" or "reasonable" necessarily entails a balancing of interests. *Hudson*, 468 U.S. at 527. Here, the Court must balance, on the one hand, society's interest in the security of its penal institutions against, on the other hand, the interest of a prisoner in making private calls over a contraband cell phone.

Cell phones in the hands of prisoners present a direct threat to prison security. This was recognized by Congress in 2010, when it passed the Cell Phone Contraband Act of 2010, Pub. L. 111-225, which prohibits the possession of cell phones by federal prisoners. As that Act's sponsor explained:

> A cell phone should never be in the hands of a prisoner. The presence of these cell phones poses a grave safety concern for staff, inmates, and the public. We know that inmates use these phones to conduct criminal business outside of prison walls, including directing gang hits, controlling drug trafficking operations and even conducting credit card fraud.

155 Cong. Rec. S10112-01 (Oct. 5, 2009) (statement of Sen. Feinstein).

Williams' interest in the privacy of his cell phone calls is no match for these security interests. *See*, *Huart*, 735 F.3d at 975–76 (person in halfway house has no reasonable expectation of privacy in cell phone that is forbidden by house rules); *United States v. Boyce*, 2015 WL 856943, at *5–6 (D.V.I. Feb. 26, 2015) (prisoner has no reasonable expectation of privacy in contraband cell phone); *United States v. Savala*, 2015 WL 468352, at *1 (S.D. Cal. Feb. 3, 2015) (same); *cf. Angel v. Williams*, 12 F.3d 786, 790 (8th Cir. 1993) ("The singular purpose of a jail is the confinement of known or suspected criminals,

- 16 -

and it is more than reasonable to expect that communications made therein between police officers and prisoners would be intercepted."). It does not matter that Williams was using the phone to contact his attorney—he could have used the DCCC's phones or met with Lefler in person, in the DCCC's attorney-client rooms. There is no reason to believe that Williams needed access to a smuggled cell phone to effectively and privately consult with Lefler.

In sum, Williams' calls to Lefler were not protected by the Fourth Amendment. Thus, the one *arguable* distinction between Williams' current lawsuit and his previous appeal is one that does not help Williams. The Court therefore finds that Williams is collaterally estopped from relitigating his Fourth Amendment claim; and alternatively, finds that the claim fails on its merits, as a matter of law.

## 2. Federal Wiretap Act

The same reasoning applies equally to Williams' claim under the Federal Wiretap Act. In the same section of his appellate brief discussed above, Williams argued that the District Court erred in not suppressing the recordings under 18 U.S.C. § 2515. That section requires the suppression of any communications if their disclosure would violate the Federal Wiretap Act. 18 U.S.C. § 2515. And disclosure violates the Act only when the communications were intercepted in violation of the Act. 18 U.S.C. § 2511(1)(c). So, in finding that suppression was not warranted, the Court of Appeals necessarily also found that the calls were not intercepted in violation of the Act. *See* 18 U.S.C. § 2511(1)(a). That, in turn, precludes Williams' claims under the Act's provision authorizing civil suits, 18 U.S.C. § 2520, which would require Williams to prove an interception or disclosure in violation of § 2511. *See* 18 U.S.C. § 2520(a).[15]

Lefler's status as Williams' attorney makes even less of a difference to Williams' claims under the Federal Wiretap Act. The only way it could potentially affect the Court's analysis is if Lefler's calls were "oral communications" as opposed to "wire communications." *See* 18 U.S.C. § 2510(1) and (2). Unlike a wire communication, an "oral communication" only includes those oral utterances made by "a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). This definition of "oral communication" incorporates Fourth Amendment privacy jurisprudence. *See*

---

[15] Williams also alleges that the government failed to minimize (i.e., stop listening when it became apparent he was engaged in an attorney-client discussion with Lefler). *See,* filing 188 at ¶ 60; 18 U.S.C. § 2518(5); *see also United States v. Cox*, 462 F.2d 1293, 1301–02 (8th Cir. 1972) (civil suit may be brought for such violations). But because Williams cannot show his calls were improperly intercepted, his failure-to-minimize claim likewise fails.

*United States v. Peoples*, 250 F.3d 630, 637 (8th Cir. 2001). Thus, before an oral communication can be protected under the Federal Wiretap Act, the individual involved must show he or she had both a subjective and objectively reasonable expectation of privacy in the conversation. *See id.* And as the Court has already explained, Williams lacked an objectively reasonable expectation of privacy.

It is of no consequence that Williams' appeal sought suppression under § 2515 while his civil suit seeks damages under § 2520. A party is precluded from relitigating an issue decided in a prior case, whether or not the issue arises on the same or a different claim or cause of action. *See Sandy Lake*, 714 F.3d at 1102. The controlling inquiry is one of substance, rather than form: whether the instant question was a matter in issue and determined. *See Mizokami Bros. of Ariz., Inc. v. Mobay Chem. Corp.*, 660 F.2d 712, 716 (8th Cir. 1981).

In sum, the one potential difference between the current lawsuit and Williams' previous appeal is, again, one that does not matter. Williams has already litigated his claims under the Federal Wiretap Act, and he is collaterally estopped from doing so again in this lawsuit.

### 3. Nebraska Wiretap Act

The same reasoning applies to preclude Williams' claim under the Nebraska Wiretap Act. The Nebraska Wiretap Act is patterned after its federal counterpart, and so the Court looks to federal law in interpreting its provisions. *State v. Strohl*, 587 N.W.2d 675, 681 (Neb. 1999). Like 18 U.S.C. § 2520, the Nebraska Wiretap Act provides a civil cause of action for persons whose communications are intercepted in violation of the Act. Neb. Rev. Stat. § 86-297. The relevant substantive provisions of the Nebraska Wiretap Act are essentially identical to those found in the federal act. *Compare* Neb Rev. Stat. § 86-290(1) and (2) *with* 18 U.S.C. § 2511(1) and (2) (listing prohibited acts); *compare* Neb. Rev. Stat. § 86-290(2) *with* 18 U.S.C. § 2511(2) (exceptions for, *inter alia*, consent by a party); *compare* Neb. Rev. Stat. §§ 86-280, 86-283 & 86-289 *with* 18 U.S.C. § 2510(1), (2), and (4) (defining "intercept," "oral communication," and "wire communication").

The Court sees nothing in the Nebraska Wiretap Act that would— under the circumstances of this case—offer broader protections than its federal counterpart or call for a different result. It does not matter that one cause of action is governed by federal law and another by state law. If two claims contain elements which are substantively identical, and those elements have been actually litigated and determined under one claim, collateral estoppel will bar relitigation of the corresponding elements under the other claim. *See Grogan v. Garner*, 498 U.S. 279, 285 (1991).

In sum, issue preclusion bars Williams' claims that the recording of his calls to Lefler violated the Fourth Amendment and the Federal and Nebraska Wiretap Acts. And to the extent that Williams' attorney-client relationship with Lefler might be considered to distinguish this case from his previous appeal, it is a distinction without merit, as to all three legal theories.

### 4. Sixth Amendment Claims

Williams also alleges that defendants interfered with his Sixth Amendment right to counsel by, among other things, recording his calls to Lefler. In contrast to the claims discussed above, the previous criminal case does not preclude Williams from litigating these claims. That is because the Sixth Amendment right to counsel is "offense specific." *Texas v. Cobb*, 532 U.S. 162, 167 (2001). And the right does not attach until the government formally initiates an adversarial judicial proceeding. *Williams*, 720 F.3d at 692 n.13. The Eighth Circuit found that Williams' Sixth Amendment right to counsel on the criminal charges had not attached until he was charged in December 2009—after all of the recordings occurred. *See id.* Portions of Williams' current lawsuit, by contrast, focuses on whether defendants interfered with his right to counsel in the supervised release proceedings— which were formally initiated much earlier. But these claims, as discussed below, fail on their merits.

### 5. Williams' Hyde Amendment Motion

In paragraph 94 of his operative complaint, Williams appears to be alleging a malicious prosecution claim based on the supervised release proceedings (and the underlying Arizona state charges). *See* filing 188 at ¶ 94. If that is what Williams meant to plead—and if not, the Court has no idea what to make of the paragraph, which borders on the incoherent—then the claim is barred by issue preclusion by a separate aspect of the supervised release proceedings.

A claim of malicious prosecution requires the plaintiff to prove, among other things, that the government lacked probable cause to commence proceedings against the plaintiff. *McKinney v. Okoye*, 842 N.W.2d 581, 591 (Neb. 2014). In the supervised release proceedings, the Court previously found that probable cause existed to believe Williams committed the violations alleged in the Amended Petition (which included the Arizona state charges); and Williams is collaterally estopped from relitigating this issue.

Following the dismissal of the Amended Petition, Williams filed a *pro se* motion for payment of attorney fees under the Hyde Amendment. VSR filing 733. Under the Hyde Amendment, courts may award attorney fees to a criminal defendant where the government's position was found to be vexatious, frivolous, or in bad faith. *See* Pub. L. No. 105–119, § 617, 111 Stat.

2440, 2519 (1997) (*reprinted in* 18 U.S.C. § 3006A, historical and statutory notes). Williams argued that (despite the clear record to the contrary) the Court had *actually* dismissed the Amended Petition because of the alleged misconduct Williams had brought to the Court's attention in his motion to withdraw his plea and dismiss the Amended Petition. VSR filing 733.

Vexatious prosecution is "without reasonable or probable cause or excuse." *United States v. Porchay*, 533 F.3d 704, 711 (8th Cir. 2008). In denying Williams' motion for fees under the Hyde Amendment, Judge Strom found not only that the government had possessed probable cause to believe that Williams had committed the violations set forth in the Amended Petition, but that the evidence of Williams' violations was "extensive." VSR filing 734 at 3. Williams appealed this determination to the Eighth Circuit, which affirmed Judge Strom's findings. *United States v. Williams*, 538 Fed. Appx. 733 (8th Cir. 2013). This is a final judgment on the merits, and it precludes Williams from now claiming that the government lacked probable cause for his arrest on the supervised release violations.

To summarize: the Court finds that Williams' claims under the Fourth Amendment, Federal Wiretap Act, and State Wiretap Act are collaterally estopped by Williams' criminal case, and that his claim of malicious prosecution (assuming that is what it is), is precluded by the Court's denial of Williams' motion under the Hyde Amendment following the dismissal of his supervised release proceedings.

## C. The *Heck v. Humphrey* Doctrine

Defendants also argue that most or all of Williams' claims under § 1983 and *Bivens* are barred by the doctrine set forth in *Heck v. Humphrey*. In *Heck*, the Supreme Court held that

> when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. 487 (footnotes omitted).[16] Thus, in order to recover damages for an allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a plaintiff must prove that the conviction or sentence has been reversed on direct appeal, declared invalid by an appropriate state tribunal, or called into question by a federal court's issuance of a writ of habeas corpus. *Id.* at 486–87. This has come to be known as the "favorable termination" requirement of *Heck*. *See Marlowe v. Fabian,* 676 F.3d 743, 745 (8th Cir. 2012).

Some of Williams' claims are plainly barred by *Heck*. For example, Williams states that defendants used Haddock to "advise [Williams] to sell weed or transport drugs from Arizona to Nebraska[—]even after [Williams'] repeated denial" and that this "constituted a violation of due process and equal protection." Filing 188 at ¶ 116. This claim necessarily calls into question the validity of Williams' prior conviction.

Williams' Sixth Amendment claims, on the other hand, are just as plainly not barred by *Heck*. As noted above, Williams' Sixth Amendment right to counsel had not attached in his previous criminal case. So, any findings with regard to his right to counsel in the supervised release proceedings would not call into question the validity of his previous conviction.[17]

However, the Court need not determine the full extent to which *Heck* might or might not bar the majority of Williams' claims. Williams' claims under the Fourth Amendment and wiretap statutes are already barred by collateral estoppel, and there is no need to separately consider whether they are barred by *Heck*.[18] And Williams' remaining claims, including his Sixth Amendment claims, fail on their merits, as discussed below, in Part "D."

---

[16] Although it arose in the context of § 1983 claims, the *Heck* doctrine also applies to claims under *Bivens*. *See, Case v. Milewski,* 327 F.3d 564, 569 (7th Cir. 2003); *Whitmore v. Harrington,* 204 F.3d 784, 784–85 (8th Cir. 2000).

[17] The defendants also argue that certain of Williams' constitutional claims, including his Sixth Amendment, are *Heck*-barred by the supervised release proceedings. Defendants assert that Williams has not satisfied *Heck*'s favorable termination requirement, because the Amended Petition was dismissed on the government's motion, in the interests of justice, and not due to Williams' innocence or any merit to his arguments. Filing 195 at 22–24. But because the charges against Williams were dismissed, his lawsuit is not challenging a "conviction or sentence." *Heck,* 512 U.S. at 487. The issue is not whether Williams obtained a favorable termination—it is whether, since Williams was never convicted, *Heck* applies at all. *McClish v. Nugent,* 483 F.3d 1231, 1251 (11th Cir. 2007). The Court finds it does not.

[18] For that matter, the Court need not decide whether *Heck*, which arose under § 1983, even applies to suits under the Federal Wiretap Act. *See, e.g., Apampa v. Layng,* 157 F.3d 1103, 1105 (7th Cir. 1998).

### D. Williams' Remaining Claims

Williams' remaining claims—many of which are discussed below—fail on their merits. The claims the Court has not explicitly discussed below have also been carefully considered and found to be without merit, but do not warrant further discussion.

### 1. Sixth Amendment Claims

The Court begins with Williams' primary Sixth Amendment claim—that defendants violated his right to counsel by recording his calls to Lefler. This claim fails on the merits, because: (1) the Sixth Amendment does not guarantee a right to counsel in supervised release proceedings; and (2) even if similar rights were available as a matter of due process, Williams has failed to show the prejudice required to state a claim for relief. Williams' other Sixth Amendment claims—that Haddock misled him into pleading guilty to the supervised release violations and disparaged Lefler—fail for the same reasons.

### (a) Recording of Calls to Lefler

Williams asserts that by listening in on his calls to Lefler, defendants were able to thwart his defense of the charges in the supervised release proceeding, in violation of his Sixth Amendment right to the effective assistance of counsel. This claim fails at the outset for the simple reason that the protections of the Sixth Amendment do not apply to supervised release proceedings. The right to counsel for such proceedings is set forth in statute, 18 U.S.C. § 3006A(a)(1)(E), and by rule, Fed. R. Crim. P. 32.1(b)(2)(D). But the Sixth Amendment applies only to "criminal prosecutions," U.S. Const. amend. VI, and a revocation of supervised release is not part of a criminal prosecution. *United States v. Ray*, 530 F.3d 666, 668 (8th Cir. 2008). Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on compliance with supervised release; thus, the full protections of the Sixth Amendment do not apply. *See id.*; *see also*, *Gagnon v. Scarpelli*, 411 U.S. 778 (1973) (no Sixth Amendment right to counsel at probation revocation hearing); *United States v. Manuel*, 732 F.3d 283, 291 (3d Cir. 2013) (supervised release); *United States v. Meeks*, 25 F.3d 1117, 1123 (2d Cir. 1994) (same) *abrogated on other grounds by Johnson v. United States,* 529 U.S. 694 (2000).

The Court will nonetheless consider Williams' Sixth Amendment argument to the extent that it may implicate a narrower right to counsel. Fundamental fairness—the touchstone of due process—may, in some circumstances, call for a (more limited) right to counsel. *Gagnon*, 411 U.S. at 790; *see, e.g.*, *Manuel*, 732 F.3d at 291; *United States v. Eskridge*, 445 F.3d

930 (7th Cir. 2006). Even if those circumstances were present, and even under the full protections offered by the Sixth Amendment, Williams' claim lacks merit, as he has failed to show how he was prejudiced.

Williams' claim is governed by the Supreme Court's decision in *Weatherford v. Bursey*, 429 U.S. 545 (1977). In *Weatherford*, an undercover law enforcement officer participated in a meeting between a criminal defendant and his attorney. *See id.* at 547–48. In the defendant's subsequent § 1983 action, the Court found that there was no Sixth Amendment violation because the agent did not communicate the substance of the conversations to prosecutors. *Id.* at 568. Because there was "no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by [the agent], there was no violation of the Sixth Amendment." *Id.* More fundamentally, because there was no prejudice to the defendant, there was no Sixth Amendment violation.

To establish a Sixth Amendment violation under *Weatherford*, Williams must show two things: first, that defendants knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant, or created a substantial threat of prejudice. *See United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986); *see also, United States v. Solomon*, 679 F.2d 1246, 1250 & n.8 (8th Cir. 1982); *Mastrian v. McManus*, 554 F.2d 813, 821 (8th Cir. 1977). A defendant is prejudiced if, for example, the proceedings leading to his conviction were adversely affected by the intrusion, or the representation he received was adversely affected. *See United States v. Kriens*, 270 F.3d 597, 603 (8th Cir. 2001). Williams' claim fails for lack of prejudice. Any potential benefit to the prosecution, or possible detriment to Williams, was undone when the Amended Petition against him was dismissed.

### (b) Remaining Sixth Amendment Claims

Williams also claims that Haddock (acting at the other defendants' behest) tricked him into pleading guilty to the supervised release charges. Along the same lines, Williams alleges that defendants enacted a policy whereby Haddock would advise Williams that Lefler was not a competent attorney and could not get him a good deal. *See* filing 188 at ¶¶ 53, 76, 91. Williams asserts that this violated his right to counsel under the Sixth Amendment.

The Court will assume, for the sake of argument, that Williams' allegations are true, and that defendants did interfere with his relationship with Lefler, or otherwise caused Williams to enter a plea in the supervised release proceedings when he would not have otherwise. These claims nonetheless fail for the same reasons as Williams' previous Sixth Amendment claim. First, there is no constitutional right to counsel in supervised release

proceedings. And second, the fact remains that the Amended Petition was dismissed. Williams has therefore failed to demonstrate how any of this alleged misconduct prejudiced him in any meaningful way. Thus, these claims fail on their merits, as a matter of law.

## 2. Claims of Outrageous Government Conduct

Williams also asserts that this same alleged misconduct (disparaging Lefler and misleading Williams into pleading guilty), as well as the recording of his calls to Lefler, amounted to outrageous government conduct that violated his right to due process. The Court is not persuaded. The "level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." *Williams*, 720 F.3d at 686. The conduct must fall "within the narrow band of the most intolerable government conduct." *Id.* And to show outrageous government conduct in the context of an intrusion into his attorney-client relationship with Lefler, Williams must show "actual and substantial prejudice." *Id.* As the Court has already explained, Williams has failed to show any prejudice, let alone substantial prejudice.

## 3. Remaining Claims Concerning the Recording of Williams' Calls to Lefler

Williams also asserts that the recording of his calls to Lefler violated his rights under a miscellany of constitutional provisions.[19] For instance, Williams claims that this somehow violated the Eighth Amendment. This claim simply does not make sense. Having his calls recorded does not amount to "punishment" that falls within that Amendment's domain. *See* filing 188 at ¶¶ 78–84.

Next is Williams' citation to the First Amendment, which the Court assumes is meant to allege a right-of-access claim. The right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government. *S.L. ex rel. Lenderman v. St. Louis Metro. Police Dept. Bd. of Police Comm'rs*, 725 F.3d 843, 850 (8th Cir. 2013). Williams has not alleged or explained how defendants interfered with his right of access to the courts. The lengthy docket sheet in the supervised release proceeding, and Williams' numerous motions therein, belie any claim to the contrary. The same holds true for Williams' claim that his rights to procedural due process were violated. He received a full and fair opportunity to litigate his claims in

---

[19] Williams also claims that the recording violated a federal regulation which prohibits prison staff from listening in on conversations between inmates and their attorneys. *See* 28 C.F.R. § 543.13(e). But that regulation, which applies to federal penal institutions, does not apply to the DCCC, which is not a federal facility. Moreover, that regulation governs in-person visits by attorneys, *see* 28 C.F.R. § 543.13(a), not calls over contraband cell phones.

the supervised release proceeding, and he has not explained what further process he is due. And, again, he has not shown any prejudice.

Finally, Williams alleges that defendants violated his equal protection rights on the basis of race, because defendants did not record conversations between white citizens and their attorneys. *See* filing 188 at ¶¶ 56, 104. The threshold inquiry for any equal protection claim is whether the plaintiff is similarly situated to others who allegedly received preferential treatment. *Gatlin ex rel. Estate of Gatlin v. Green*, 362 F.3d 1089, 1094 (8th Cir. 2004). Williams' claim does not pass this threshold. He has not alleged that there were any white DCCC inmates similar to him—that is, inmates who were paying attorneys to smuggle cell phones into the detention center, which they would then use to manage their drug operations. In sum, Williams has not pleaded any viable claims arising from the recording of his calls to Lefler.

## 4. Disclosure of Recordings

Separate from their recording and use in the criminal case, Williams takes issue with the fact that the recordings of his conversations with Lefler were released to his co-defendants and the public. Williams alleges that these conversations are available in online audio records of his court proceedings. And, he claims, this has caused him emotional distress. Filing 188 at ¶¶ 37–38. As the Court has already noted, the wiretap statutes will not avail Williams, as disclosure of intercepted recordings is only actionable if the interception was itself unlawful. Nor does this disclosure enhance the prospects of any of Williams' constitutional claims—they remain without merit. Williams has also alleged (in a conclusory fashion) a state-law invasion of privacy claim. *See* filing 188 at 8. But that claim likewise fails.

Nebraska's invasion-of-privacy torts are codified in statute: "It is the intention of the Legislature to provide a right of privacy as described <u>and limited</u> by sections 20-201 to 20-211 and 25-840.01, and to give to any natural person a legal remedy in the event of violation of the right." Neb. Rev. Stat. § 20-201 (emphasis supplied). Williams' claim would fall under § 20-203, which provides that: "Any person . . . that trespasses or intrudes upon any natural person in his or her place of solitude or seclusion, if the intrusion would be highly offensive to a reasonable person, shall be liable for invasion of privacy."

In evaluating a claim for invasion of privacy under § 20-203, Nebraska courts have turned to the Restatement (Second) of Torts § 652B for guidance. *See Whipps Land & Cattle Co., Inc. v. Level 3 Commc'ns, LLC*, 658 N.W.2d 258, 269–70 (Neb. 2003). And the accompanying caselaw makes clear that to state a claim for relief, the intrusion must be into some matter in which the plaintiff has a legitimate expectation of privacy. *See, e.g., Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 260 (3d Cir. 2004) (applying Pennsylvania law);

*Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812–13 (9th Cir. 2002) (Arizona law); *Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871, 875 (8th Cir. 2000) (Arkansas law); *Gates v. Black Hills Health Care Sys. (BHHCS)*, 997 F. Supp. 2d 1024, 1033 (D.S.D. 2014); *Rasmusson v. Chisago Cnty.*, 991 F. Supp. 2d 1065, 1078 (D. Minn. 2014). The Court has already found that Williams lacked a legitimate expectation of privacy in his conversations conducted over a smuggled cell phone—whether with Lefler or his criminal associates—and so this claim also fails as a matter of law.

### 5. Claims Related to Williams' Habeas Case

Williams' next claims relate to an alleged conspiracy to set him up for failure in a previous habeas case he filed in this district. On August 4, 2009, Williams filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2241, requesting his release from the custody of the United States Attorney General and Warden Jeffrey Newton of the Douglas County Department of Corrections. Case no. 8:09-cv-262, filing 1. Williams asserted that his imprisonment (apparently referring to the term of supervised release imposed in relation to his 1994 conviction) was a violation of the "Ku Klux Klan Act of [1871]," in that the disparity in sentences for powder and crack cocaine resulted in disparate treatment on the basis of race. Case no. 8:09-cv-262, filing 1. On September 25, the Court (Judge Strom) issued an Order finding that the petition was too vague to present a cognizable claim for relief, but gave Williams until October 4 to submit an amended petition. Williams did not submit an amended petition, and the case was dismissed on November 5. Case no. 8:09-cv-262, filings 4, 5, and 6.

Williams claims that in June 2009, Haddock provided him with research and an outline for a habeas motion based on the Ku Klux Klan Act of 1871, for which he paid Haddock $5,000. Filing 188 at ¶¶ 28, 39, 40. Williams alleges that this was the result of a conspiracy by all the defendants, who did this with the intent to defraud him and to impede him from prevailing in a habeas motion to overturn his 1994 conviction.

Williams alleges that this deprived him of effective assistance of counsel. Filing 188 at ¶ 77. But there is no constitutional or statutory right to counsel in a habeas proceeding. *See Pennsylvania v. Finley,* 481 U.S. 551, 555 (1987). Williams also claims that this violated his due process rights and right of access to the courts. Filing 188 at ¶ 77. But he has not explained what further process he was due, nor how his right of access was meaningfully prejudiced—especially in light of the fact that Williams failed to respond to the Court's order to amend his petition. Williams had access to a judicial forum for his habeas motion. But he failed to utilize that forum, and

he cannot now claim a constitutional violation when it was his own inaction that resulted in the case being dismissed.

Williams also alleges that defendants violated his right to equal protection, asserting that defendants "targeted [Williams] because he was an African American citizen and more likely to believe their the [sic] fabrications that the law firm Defendants were going to get the crack law overturned using the Klu [sic] Klux Klan Act of 1871,[]through [t]he filing of a writ of habeas corpus." Filing 188 at ¶ 72. As with Williams' other equal protection claim, however, he has failed to allege, let alone show, the existence of any similarly-situated inmates of other races.

The Court has carefully considered all of Williams' constitutional claims—including each one that has not been specifically discussed—and finds them to be without merit. So, Williams' claim that defendants conspired to commit various constitutional violations is also without merit. Without an actual constitutional violation, there is no actionable conspiracy under § 1983 or *Bivens*. *See Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 798 (8th Cir. 2013).

Similarly, Williams has included in his complaint a number of allegations that defendants conspired with one another to violate his constitutional rights; and that defendants destroyed recordings which contain evidence of these violations and the alleged conspiracy against him. *See, e.g.*, filing 188 at ¶¶ 35, 53, 61, 117. These allegations are vague and conclusory; and Williams has not pleaded specific factual content to render these allegations plausible; nor has he produced any evidence to substantiate these claims. Moreover, the Court has already assumed the truth of Williams' factual allegations. Even if Williams could prove that defendants engaged in all the acts he has alleged, he would still have failed to show an underlying violation of his constitutional rights.

### 6. Claims Under the Nebraska Constitution

For each of the alleged violations discussed above, Williams has also pleaded claims arising under the corresponding provisions of Nebraska's constitution. *See* filing 188 at 7. However, he has not identified any way in which Nebraska's constitution differs from the federal Constitution on the issues presented in this case. Nor has the Court found any such differences.[20] Thus, all of Williams' claims also fail under Nebraska's constitution.

---

[20] In particular, the Court notes that Nebraska's constitutional provision for assistance of counsel in a criminal case has been held to be no broader than its federal Sixth Amendment counterpart. *State v. Stewart*, 496 N.W.2d 524, 529 (Neb. 1993).

## 7. RICO

Williams next alleges that defendants "engaged in a RICO conspiracy to deprive and defraud [him] of thousands of dollars in cash payments for legal services the law firm . . . had no intention of performing." Filing 188 at ¶ 106. In his separate affidavit in support of his complaint, Williams alleges that he paid a total of $22,500 on three occasions, twice in December 2008 and once in January 2009. Filing 189 at ¶ 4. Williams alleges that each of these payments came "as a direct result of defendant Haddock demanding sums of cash to be lawfully retained for his legal services in telephone conversations at either his law firm . . . or on his cell-phone." Filing 189 at ¶ 5.

Williams avers that $10,000 of these fees were paid to Haddock so that he could work on a defense to a possible future indictment against Williams for distributing marijuana. Filing 189 at ¶¶ 6(A)—(D). Williams claims that this retainer "included a joint defense agreement with Richard Conway wherein anything learned in the criminal prosecution would be shared between us." Filing 189 at ¶ 6(E). Williams avers that another $7,500 was demanded by Haddock and the Law Firm Defendants for Haddock's work in "researching, writing[,] and formulating a plan of action wherein . . . Haddock would draft a motion to get the crack-cocaine law declared illegal in violation of the KU KLUX KLAN ACT" which would get Williams' 1994 conviction overturned. Filing 189 at ¶ 6(F); *see also* filing 188 at ¶ 39. Williams avers that the last $5,000 was paid as a general retainer to Haddock and the Law Firm Defendants so that they would be available to represent Williams and his family members on anything that came up. Filing 189 at ¶ 6(G).

A RICO claim requires, among other things, proof that defendants engaged in a pattern of racketeering activity. *See,* 18 U.S.C. §§ 1962, 1964; *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011). "[R]acketeering activity" is defined to include a number of predicate offenses, including wire fraud in violation of 18 U.S.C. § 1343. 18 U.S.C. § 1961(1)(B). Williams is using the alleged acts of fraud discussed above (in December 2008 and January 2009) as the predicate acts of wire fraud to support his RICO claim. *See* filing 188 at 7. The Court will assume, for the sake of argument, that these alleged acts did constitute wire fraud. Even so, Williams has failed to state a claim for relief under RICO, as he has not alleged a pattern of racketeering.

A pattern of racketeering is shown through two or more related acts of racketeering activity that amount to or pose a threat of continued criminal activity. *Crest Const. II*, 660 F.3d at 356. To satisfy RICO's continuity element, a plaintiff must allege multiple predicate acts occurring over a substantial period of time (closed-end continuity) or allege facts showing that the predicate acts threaten to extend into the future (open-ended continuity).

*See id.* Williams has not alleged acts of fraud which suggest repetition into the future. So, he must proceed under a closed-ended theory of recovery. And that is problematic for Williams, because that requires allegations or proof of related acts continuing over a substantial period, which must be at least one year in duration. *Id.* at 357. The alleged acts of wire fraud discussed above all occurred in late 2008 and early 2009, which is far short of 1 year.[21] Thus, Williams' RICO claims fail as a matter of law.

### 8. Public Protection Act

Williams also claims that defendants violated Nebraska's "little RICO," the Nebraska Public Protection Act. The Court will assume, for the sake of argument, that the fraud alleged above constitutes a pattern of racketeering activity as defined by that Act. *See* Neb. Rev. Stat. § 28-1354(2) and (5). Even so, Williams' claim fails, as the Public Protection Act does not provide for a private right of action.

The Public Protection Act is part of the Nebraska Criminal Code, *see* Neb. Rev. Stat. § 28-101, and it does not explicitly provide for a private cause of action. A criminal statute may provide an implied private right of action, but only if the Legislature so intended in enacting the statute. *Wisdom v. First Midwest Bank, of Poplar Bluff,* 167 F.3d 402, 408 (8th Cir. 1999); *see also Prof'l Mgmt. Midwest, Inc. v. Lund Co.,* 826 N.W.2d 225, 233 (Neb. 2012). And courts are reluctant to infer a private right of action from a criminal statute. *See id.; see also, Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 190–91 (1994); *Frison v. Zebro,* 339 F.3d 994, 999–1000 (8th Cir. 2003); *Kunzer v. Magill,* 667 F. Supp. 2d 1058, 1061 (D. Minn. 2009). In sum, nothing in the text of the Public Protection Act suggests that the Nebraska Legislature intended to imply a private right of action, and Williams' claim under the statute fails as a matter of law.

---

[21] Williams has also alleged that he paid Haddock and the Law Firm Defendants another approximately $12,000 from April through December 2009. Filing 188 at ¶ 106. But Williams has not shown that these alleged acts of fraud constituted wire fraud under 18 U.S.C. § 1343. The wire fraud statute requires that the defendant communicate by wire "in interstate or foreign commerce" in furtherance of a scheme to defraud. 18 U.S.C. § 1343. The statute does not penalize mere usage of the channels or instrumentalities of interstate commerce. *See,* 18 U.S.C. § 1343; *United States v. Phillips,* 376 F. Supp. 2d 6 (D. Mass. 2005). Rather, the calls or communications themselves must cross state lines. *See, e.g., Smith v. Ayres,* 845 F.2d 1360, 1366 (5th Cir. 1988); *Meier v. Musburger,* 588 F. Supp. 2d 883, 907 (N.D. Ill. 2008). There is no basis to conclude that any of these alleged payments were prompted by interstate calls, as Haddock and the Law Firm Defendants were all based in Nebraska, and Williams was confined in Nebraska, at the DCCC, for this entire period. Thus, Williams has failed to allege any additional acts of wire fraud sufficient to constitute a pattern of racketeering activity.

9. Remaining Claims for Breach of Contract, Fraud, and Unjust Enrichment

Williams alleges that he paid Haddock a total of $22,500 to represent "his interest[s] in numerous legal matters." Filing 188 at ¶ 48; filing 189 at ¶ 6. Williams claims that Haddock was, at that time, an attorney with RR&P. *See* filing 189 at ¶ 4. By accepting this money and working on certain legal matters for him, Williams asserts that Haddock and the Law Firm Defendants entered into a contract. Filing 188 at ¶ 48. Among other alleged fraudulent acts, Williams claims that Haddock and the Law Firm Defendants misrepresented that they had secured the release of Williams' nephew, who was facing felony gun charges. Williams claims that, in exchange, defendants deducted $1,500 from the general retainer Williams had paid. In fact, Williams contends, these defendants had lied about getting his nephew's charges dismissed. *See* filing 188 at ¶ 49; filing 189 at ¶ 6h. And Williams alleges that Haddock and the Law Firm Defendants did this at the behest of the remaining defendants.

*(a) Defendants Other Than Haddock and the Law Firm Defendants*

The Court will begin with Williams' claims against the defendants other than Haddock and the Law Firm Defendants. As noted above, Williams has not alleged a breach of contract or unjust enrichment claim against the other defendants—none of them were parties to any contract, nor did they obtain any property which they ought to return to Williams. *See* note 6, *supra*. Assuming, for the sake of argument, that Williams has alleged a plausible claim of fraud against the other defendants, any such claim would be barred by Nebraska's PSTCA.

The PSTCA is the exclusive means by which a tort claim may be maintained against a political subdivision or its employees. Neb. Rev. Stat. § 13-902; *Brock v. Dunning*, 854 N.W.2d 275, 286 (Neb. 2014). Where a claim against an employee of a political subdivision is based upon acts or omissions occurring within the scope of employment, it is governed by the PSTCA. *McKenna v. Julian*, 763 N.W.2d 384, 391 (Neb. 2009).

The PSTCA applies to Williams' claims against the defendants who are political subdivisions, *see* Neb. Rev. Stat. § 13-903(1), that is, Douglas County, the Municipal Defendants, and the remaining defendants in their official capacities. It also applies to his claims against the individual defendants in their individual capacities, so long as their allegedly tortious conduct occurred while they were acting within the scope of their employment for their respective political subdivisions. *See Kruger v. Nebraska*, ___ F. Supp. 3d ___, 2015 WL 518748, at *6 (D. Neb. Feb. 9, 2015) (citing *Bohl v. Buffalo Cnty.*, 557 N.W.2d 668, 674 (Neb. 1997)). Williams has not alleged any facts to suggest that Foxall, Newton, Stuck, Brazda, or Bruck

were acting outside their employment for Douglas County and their respective police forces. Thus, the PSTCA applies to his claims against those defendants in their individual and official capacities.[22]

The PSTCA provides only for a limited waiver of sovereign immunity, which is subject to statutory exceptions. And if an exception applies, the claim is barred by sovereign immunity. *Hall v. Cnty. of Lancaster*, 846 N.W.2d 107, 114 (Neb. 2014). These exceptions to the PSTCA's waiver of sovereign immunity include "[a]ny claim arising out of . . . misrepresentation, deceit, or interference with contract rights." Neb. Rev. Stat. § 13-910(7). Williams' fraud claim "arises" from alleged acts of misrepresentation or deceit. He has not alleged or shown any facts that would explain how these defendants would otherwise be liable. Therefore, they are entitled to sovereign immunity.

### (b) Haddock and the Law Firm Defendants

That brings the Court back to Williams' claims for fraud, unjust enrichment, and breach of contract against Haddock and the Law Firm Defendants. These claims arise solely under state law and do not invoke the Court's federal question jurisdiction. Nor are the requirements for diversity jurisdiction satisfied. Diversity jurisdiction requires an amount in controversy greater than $75,000 and complete diversity of citizenship among the litigants. 28 U.S.C. § 1332(a). The Court will assume for the sake of argument that complete diversity existed when the suit commenced. But it is apparent from the face of Williams' operative complaint that his remaining claims do not implicate an amount in controversy greater than $75,000.

Adding together all of the potential sums Williams alleges he paid over to Haddock and the Law Firm Defendants fetches a total of, at most, $34,500. *See* filing 188 at ¶ 106. Williams has also requested damages for emotional distress caused by the disclosure of his calls to Lefler. *See* filing 188 at ¶¶ 38, 52. But those claims have been dismissed. And his claims for breach of contract and fraud do not support damages for emotional distress. *See, Tolliver v. Visiting Nurse Ass'n of Midlands*, 771 N.W.2d 908, 916 (Neb. 2009); *Braesch v. Union Ins. Co.*, 237 Neb. 44, 464 N.W.2d 769, 772 (1991), *overruled on other grounds by Wortman ex rel. Wortman v. Unger*, 254 Neb. 544, 578 N.W.2d 413, 417 (1998). Finally, a claim of unjust enrichment amounts to a claim that the defendant has received and retained money that, in justice and fairness, he ought to pay to the plaintiff. *See Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 302 (Neb. 2006). By its nature, then, a claim of unjust enrichment does not support damages for emotional distress. Williams

---

[22] Even if the Federal Defendants were acting under color of federal law, they remained employees of Nebraska political subdivisions, and so fall within the ambit of the PSTCA.

has also requested a broad range of punitive damages. But Nebraska law, which governs his state-law claims, does not allow for punitive damages. *Golnick v. Callender*, 860 N.W.2d 180, 190 (Neb. 2015).

Under 28 U.S.C. § 1367(c)(3), the Court may decline to exercise supplemental jurisdiction where the Court has dismissed all claims over which it has original jurisdiction. *Mountain Home Flight Serv., Inc. v. Baxter Cnty., Ark.,* 758 F.3d 1038, 1045 (8th Cir. 2014). If the Court declines to exercise supplemental jurisdiction, it may remand the case to state court. *See Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 644 (8th Cir. 2008). While this determination is a matter of discretion for the Court, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). The Court has weighed each of these factors and finds remand is appropriate. Therefore, the Court will remand Williams' remaining claims to the District Court for Douglas County, Nebraska.

One final matter bears noting. This Memorandum and Order will not be accompanied by a separate, formal "Judgment." Several claims yet remain to be resolved—albeit in state court. However, Williams is notified that although this Court is not entering a judgment at this time, this Memorandum and Order is nonetheless a final, appealable order. *See Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 542 (8th Cir. 1996).

THEREFORE, IT IS ORDERED:

1.   Williams' motion for summary judgment (filing 214) is denied.

2.   The motions for dismissal or for summary judgment filed by defendants John Brazda, Dave Bruck, and John Stuck (filing 194); the City of Bellevue (and its Police Department) (filing 196); Douglas County, Mark Foxall, and Jeffrey Newton (filing 198); and the City of Omaha and Omaha Police Department (filing 204) are granted. Williams' claims against these defendants are dismissed.

3.   The motions for dismissal or for summary judgment filed by Haddock and the Law Firm Defendants (filings 200 and 202) are granted in part and denied in part, as set forth

above. Williams' claims against them for fraud, unjust enrichment, and breach of contract remain.

4.   Williams' request for an evidentiary hearing (filing 246) is denied.

5.   Williams' request to conduct limited discovery (filing 248) is denied.

6.   This case is remanded to the District Court for Douglas County, Nebraska.

7.   The Clerk's Office is directed to mail a copy of this Memorandum and Order to Williams at his address of record.

Dated this 6th day of May, 2015.

BY THE COURT:

John M. Gerrard
United States District Judge